IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 19-05-M-DWM |
| Plaintiff/Respondent, | |
| vs. | ORDER |
| MARK ALLEN McNEELY, SR., | |
| Defendant/Movant. | |

Defendant/Movant Mark Allen McNeely, Sr. filed a motion to vacate, set
aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. (Docs. 45 and 48.)
After additional briefing, the Court held an evidentiary hearing on November 23,
2021. Based on the record, the motion will be denied.

## I.    Factual and Procedural Background

On March 7, 2019, a grand jury indicted McNeely on twelve counts related
to distribution, transportation, and receipt of child pornography, at various times
from 2013 to 2018. (Doc. 1.) McNeely eventually pled guilty and was sentenced
on October 11, 2019. The Court adopted the presentence report without change.
Based on a total offense level of 34 and a criminal history category of I,
McNeely's advisory guideline range was 151 to 188 months. To fulfill the
sentencing objectives of 18 U.S.C. § 3553(a), the Court varied below the guideline

1

to a sentence of 144 months in prison, to be followed by a ten-year term of supervised release. (Docs. 40, 41, 42.)

McNeely timely filed his motion to vacate under 28 U.S.C. § 2255 on October 13, 2020. The Court initially screened McNeely's motion pursuant to its obligations under 28 U.S.C. § 2255(b) and Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. (Doc. 49.) McNeely's motion identified two grounds for his claim of ineffective assistance of counsel: failure to contest the number of images for which he was held responsible, and failure to file a notice of appeal. The Court concluded that McNeely's first ground failed to pass screening; he did not carry his burden to establish that the performance of his counsel John Rhodes fell outside the wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

However, without further evidence, the Court declined to rule on McNeely's second ground, that he had directed Rhodes to file a notice of appeal, and Rhodes failed to do so. The Court appointed counsel to represent McNeely on this motion and ordered a supplemental brief to explain McNeely's position as to his instructions to counsel. McNeely filed an affidavit in support of his supplemental brief, explaining his discussions with Rhodes regarding appeal. (Docs. 56 and 56-1.)

2

The Court held an evidentiary hearing, at which McNeely testified by telephone, his girlfriend Linda McGillis testified by ZOOM at the evidentiary hearing. The United States presented the testimony of McNeely's former counsel John Rhodes by ZOOM, and the telephone or ZOOM testimony two members of his staff at the Federal Defenders of Montana ("FEDERAL DEFENDERS") office in Missoula, paralegal Benjamin Anderson, and legal assistant Amanda Miller. The factual findings that follow are based on the testimony at this evidentiary hearing, McNeely's affidavit, and his change of plea and sentencing hearings.

McNeely testified that he did not sign a plea agreement because he wanted to maintain his ability to appeal. He testified that Rhodes had explained to him what the appeal waiver in the government's proposed plea agreement meant, and he decided to reject the agreement for that reason. He also said that he met with Rhodes prior to his sentencing, which they had discussed plea agreement or no on numerous occasions. McNeely had a target in mind that he should only be subject to a mandatory minimum 60-month sentence, despite the fact that his guideline range was 151 to 188 months. He felt anything more than a 60-month sentence was ridiculous, and he would appeal it.

McNeely did not specifically remember what he discussed with his counsel after sentencing, saying he was "shell shocked." But he does say that he told Rhodes to appeal, and his recollection is that Rhodes responded in some unspecific

but affirmative manner. He specifically remembered that Rhodes and the Court both told him that he had 14 days to file any notice of appeal. Conflictingly, McNeely's affidavit states that he told the Court at sentencing that he would not appeal. (Doc. 56-1 at 2.) When asked about this statement at the hearing, McNeely stated that he has a less clear recollection of exactly what happened at his sentencing, stating that it was "traumatic." He also recalls telling his girlfriend McGillis about the appeal, and eventually directing her to contact the Court and Rhodes' office to find out the status of his appeal.

McGillis testified that she attempted to contact the Clerk of Court to no avail. In support of her testimony, she filed a page from her personal journal that she claims she wrote after she spoke with McNeely following his sentencing. (Doc. 58-1.) McGillis never attended any meeting between McNeely and his defense team and was not in Montana at the time of his sentencing or leading up to it.

McNeely also testified that he had regular communications with Rhodes and the FEDERAL DEFENDERS office throughout the case, and whenever anything was filed in the Court, he would receive a copy within a day or two. He was in Missoula County jail for four or five weeks after his sentencing, and he never received any notice of appeal. Within his first two weeks post-sentencing, he never contacted Rhodes' office.

Counsel Rhodes testified at the hearing about his interactions with McNeely, based on his decades of representing clients while at the Montana Federal Defenders and based on his office records specifically relating to McNeely. Referring to his case notes, Rhodes testified that he had ten face-to-face meetings with McNeely, spoke with him four times on the telephone, and sent him 35 letters, during the course of his representation. He testified that his office endeavors to mail any court filings to the client the day they are filed, but occasionally they are mailed the next day. Nineteen of the letters Rhodes sent to McNeely included court filings, including McNeely's presentence report and the government's proposed plea agreement.

Rhodes met with McNeely to discuss the pros and cons of signing the plea agreement, and ultimately, McNeely decided enter an open plea. One of the concerns Rhodes had throughout McNeely's case arose during his initial detention hearing, six weeks or so after his arrest. The Court's detention order detailed testimony that raised the possibility that McNeely had committed hands-on crimes with which he had not yet been charged. (Doc. 25 at 4.) The evidence at this hearing provided context for Rhodes' ongoing strategy regarding McNeely's case.

Rhodes met with McNeely twice prior to sentencing, once two weeks before and again the day before. At these meetings, they discussed the possibility of

appeal. Rhodes explained the pros and cons of appealing. They also discussed the timeframe of any appeal.

At sentencing, McNeely was sentenced below the guideline range, which, in Rhodes' view, would make his sentence virtually guaranteed to be affirmed on appeal.

At this point, Rhodes' recollection diverges from McNeely's. While McNeely recalls meeting Rhodes in the U.S. Marshals' holding area in the courthouse, Rhodes' recollection and notes do not reflect that the meeting took place. Rhodes testified that his practice is to wait for court to adjourn, and then the Marshals usually allow him a moment or two to confer with his client. At that point, Rhodes tells his client if he thinks there are issues to appeal and reminds him that if he wants to appeal and whether Rhodes believes there are even appealable issues, Rhodes must know within fourteen days. Rhodes testified that he was certain McNeely did not tell him to appeal, and that if he had, he would have filed the notice. Rhodes explained the virtually automated procedure his office follows when a client asks to appeal, and how the office errs on the side of filing a notice that can later be dismissed, what he referred to as a "placeholder."

Rhodes denies agreeing with his client to appeal if McNeely got more than the 60 months the defendant wanted as a sentence. He stated that he does not make promises contingent on the outcome of a hearing that has not yet happened. He

explained that there are too many variables at play prior to sentencing, and there may be too many downsides of an appeal. Part of the downside, in Rhodes' view, were the facts elicited at the detention hearing that were adverse to McNeely and appeared in the presentence report as well.

Rhodes sent McNeely the judgment on the day of sentencing and advised him to call if he had any questions about the judgment or the case. Rhodes did not receive any further phone calls from McNeely.

## II.    Analysis

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant who claims ineffective assistance of counsel must prove (1) "that counsel's representation fell below an objective standard of reasonableness," 466 U.S. at 687–688, 104 S.Ct. 2052, and (2) that any such deficiency was "prejudicial to the defense," *id.,* at 692, 104 S.Ct. 2052. However, a failure to appeal when instructed to do so is almost categorically considered ineffective assistance of counsel, regardless of prejudice to the defendant.

> We have long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable… ("[W]hen counsel fails to file a requested appeal, a defendant is entitled to [a new] appeal without showing that his appeal would likely have had merit").

*Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (internal citations omitted). The United States Supreme Court revisited the issue in *Garza v. Idaho*, in which it held that a notice must be filed when the defendant requests it, even if the defendant has waived the right to appeal, making an appeal presumably futile. 139 S. Ct. 738, 203 L. Ed. 2d 77 (2019). "Where, as here, a defendant has expressly requested an appeal, counsel performs deficiently by disregarding the defendant's instructions." *Garza v. Idaho*, 139 S. Ct. 738, 746, 203 L. Ed. 2d 77 (2019).

Here, the dispositive question is whether McNeely directed Rhodes to appeal. If he did, Rhodes' performance was unreasonably deficient in failing to do so. If he did not, in light of the reasons for rejecting the plea agreement did Rhodes have any further obligation to presume anything about McNeely's intentions?

Because of the variety of circumstances encountered by defense counsel, "courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and [j]udicial scrutiny of counsel's performance must be highly deferential." *Flores-Ortega*, 528 U.S. at 477 (citing *Strickland*, internal citations and quotations omitted.)

*Flores-Ortega* set a minimum bar: if the client has not expressed a view, counsel must consult on the issue. In *Flores-Ortega*, the U.S. Supreme Court rejected the Ninth Circuit's bright line requiring counsel to file a notice of appeal unless specifically instructed otherwise. The Supreme Court instead focused on

8

whether counsel consulted with the client, "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes. If counsel has consulted with the defendant, the question of deficient performance is easily answered: Counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal." *Flores-Ortega*, 528 U.S. at 478.

Here, based on the evidence presented, Rhodes consulted with McNeely about his appeal on multiple occasions. Rhodes and McNeely discussed appeal as early as the plea agreement phase, when McNeely expressly wanted to preserve his right to appeal. Clearly, at an early phase, McNeely wanted to keep that option open. However, Rhodes' testimony also demonstrated that he discussed with McNeely that an appeal of a below-guidelines range sentence, when the record included very bad facts for McNeely, may very well result in a higher sentence. Though he argued for McNeely's preferred sentence at the sentencing hearing, Rhodes was satisfied that the sentence McNeely got was as good as he was likely to get, and the downsides of appealing it were considerable. The record unequivocally shows that Rhodes repeatedly consulted with McNeely about the virtues and hazards of appeal.

The trickier question is whether, despite all that discussion, McNeely expressly directed Rhodes to file the notice. The evidence leads to the conclusion

he did not. First, McNeely himself admits to being "shell-shocked" after the hearing and not having clear recollections of what occurred. In his affidavit, he stated that he had told the Court he did not intend to appeal. The sentencing transcript does not include that statement from him, and when pressed at the evidentiary hearing, he could not recall exactly what that statement was based on. It is most likely that at the time of sentencing McNeely understood the risks of upsetting the apple cart of a below guideline sentence and he did not, in fact, intend to appeal. There is ambiguity and vagueness in his recollections of directing Rhodes to file the notice. Quite likely he is still convinced that he is or was entitled to a sentence of only sixty months and seeks any advantage he might be able to construct to achieve that goal.

On the other hand, Rhodes' certainty that he was not directed is compelling. As Rhodes pointed out, his office's system for filing the notices is practically automatic: a placeholder notice is sent even if the defendant is unsure of whether to appeal. "[F]iling a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes." *Flores-Ortega,* 528 U.S. at 477. Had he been directed to file it, even if he thought it was a risky or bad idea, Rhodes would have done so.

In addition, Rhodes sent two follow-up pieces of mail to McNeely that day and a few days later, with his contact information. The records of Rhodes' office

and the testimony of his staff show that McNeely never contacted Rhodes about an appeal. There is an absence of reliable proof that McNeely specifically told Rhodes to appeal, even after consultation about the issue.

While *Garza* and *Flores-Oretega* may push counsel into filing notices for appeals that they feel are risky or even waived, they do not require that counsel read their clients' minds. Rhodes and McNeely had discussed the appeal issue repeatedly, and Rhodes had made it clear that despite McNeely's belief that the sentencing guidelines were ridiculous, a below guidelines sentence was the best he could hope for. Rhodes thought the outcome of the sentencing hearing was satisfactory and, based on their prior consultations on the downside of appealing, if McNeely did not direct him at the point to file the notice, Rhodes was not obliged to do so.

*Flores-Ortega* encourages consideration of whether the defendant went to trial or pled guilty and waived appeal rights. Such factors should influence counsel's consultations regarding appeal. "Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal." *Roe v. Flores-Ortega*, 528 U.S. 470, 480 (2000). McNeely's position appears to be that his unwillingness to agree to a plea waiver should be dispositive. However, he still pled guilty to multiple counts— counts

11

where he did not dispute that his guilt or the offer of proof, he simply did not like the sentence imposed. After months of reviewing the evidence, reviewing the presentence report, and consultation with his counsel before he entered an open plea to the indictment's many counts, it would not be unreasonable for him to abandon an appeal to avoid the risk of new charges or a sentence within or above the sentencing guidelines. The threshold reason to reject a plea agreement and to enter an open plea does not invalidate his later failure to specifically direct counsel to file an appeal despite advice of counsel to the contrary.

Accordingly, IT IS ORDERED:

1.  McNeely's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 45) is DENIED.

2.  The clerk shall ensure that all pending motions in this case and in CV 20-151-M-DWM are terminated and shall close the civil file by entering judgment in favor of the United States and against McNeely.

DATED this  2nd  day of December, 2021.

Donald W. Molloy
United States District Court